IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **VISION BANK,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO.: 10-00521-KD-B** |
| | ) | |
| **145, LLC and Cynthia C. Kessler,** | ) | |
| **Defendants.** | ) | |

## ORDER

This matter is before the Court on Plaintiff Vision Bank's Motion for Summary Judgment on

Counts One and Two of its Complaint (Docs. 142-144), Defendants' Response (Doc. 159) and Vision

Bank's Reply (Doc. 162); and Vision Bank's Motion for Summary Judgment on 145, LLC and Cynthia

C. Kessler's Counterclaims (Docs. 147-150); Counterclaim-Plaintiffs' Response (Doc. 161); and Vision

Bank's Reply (Doc. 163).

## I.    Procedural History

On September 22, 2010, Plaintiff Vision Bank ("Vision Bank") filed a Complaint against

Defendants 145, LLC ("145") and Cynthia C. Kessler ("Kessler")[1] alleging claims for breach of

contract (Count One) and guaranty obligations (Count Two). (Doc. 1).  Defendant 145 and Kessler

answered the Complaint on November 18, 2010 and December 15, 2010, respectively. (Docs. 26, 47).

145 asserted counterclaims against Vision Bank for breach of contract (Count One), wrongful

foreclosure (Count Two) and declaratory judgment (Count Three); and Kessler asserted counterclaims

against Vision Bank for wrongful foreclosure (Count One), breach of contract (Count Two) and

declaratory judgment setting aside the foreclosure sale (Count Three).  (Id.)  On May 11, 2011, 145

amended its answer to assert counterclaims for unjust enrichment (Count Four), fraudulent suppression

---

1 Vision Bank originally initiated this action against additional defendants who have been dismissed from

(Count Five), and fraudulent misrepresentation (Count Six).  (Doc. 111).

## II.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Rule 56(c) governs procedures and provides as follows:

(1) *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

   (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

   (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

(4) *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).  Vision Bank, as the party seeking summary judgment, bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those portions of

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  Clark v.

Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S.

_____

this case, namely Scott D. Deichman, James Dalton and David J. Lukinovich.

317, 323 (1986)).  If the non-moving party fails to make a sufficient showing on an essential element of

its case with respect to which it has the burden of proof, the moving party is entitled to summary

judgment.  Celotex, 477 U.S. at 323.  In reviewing whether the non-moving party has met its burden,

the court must stop short of weighing the evidence and making credibility determinations of the truth of

the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are

to be drawn in its favor.  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992)

(internal citations and quotations omitted).

## III.    Factual Background

The record reveals that in June 2005, Defendant 145 applied for a loan from Vision Bank to

finance the purchase of certain land located in Baldwin County, Alabama: Lots 1 and 2 of Emerald

Shores (beach front property in Orange Beach, Alabama). (Doc. 143-7 at 1 (Aff. Duncan at ¶2)).[2]

On June 10, 2005, Defendant Kessler (as well as others who are no longer defendants) executed

an unlimited continuing guaranty agreement in favor of Vision Bank.  (Doc. 143-7 at 5 (Aff. Duncan at

¶¶16-17); Doc. 1-5).  By so doing, Kessler "jointly and severally, unconditionally and absolutely

guaranteed[d] the due and punctual payment of all sums due under the Loan [to be extended to 145] the

interest thereon, and any other moneys due or which may become due thereunder." (Doc. 1-5 at 1 at

¶1).  In this Guaranty, Kessler expressly "waive[d]…demand for payment…non-payment at maturity

and indulgences and notices of every kind[.]"  (Id. at 2 at ¶4).

On June 14, 2005, Claud Clark prepared an appraisal on the property which valued same at

$14.4 million.  (Doc. 159-2).

On June 15, 2005, Defendant 145 executed a Loan Agreement for Acquisition Financing and a

Promissory Note with Vision Bank in the amount of $8,933,000.00, which was due on January 29,

---

2 Erica Duncan is the Special Assets Supervisor of Vision Bank.  (Doc. 143-7 at 1 (Aff. Duncan at ¶1)).

2006.  (Doc. 143-7 at 2 (Aff. Duncan at ¶¶4-5); Doc. 143-7 at 9-13; Doc. 1-1; Doc. 1-2).  The

Promissory Note was secured by a Future Advance Mortgage and Security Agreement from 145 in

favor of Vision Bank, and held as collateral for the property (which was then owned in fee simple by

Defendant 145).  (Doc. 143-7 at 1 (Aff. Duncan at ¶19); Doc. 143-7 at 22-42).  The Loan Agreement

provides for notices to be sent to 145, via "145, LLC, 1000 Riverbend Boulevard, Suite A, St. Rose,

LA, 70097 (Attn.: James Dalton)," with a copy to be sent to "David J. Lukinovich, 5740 Citrus

Boulevard, Suite 102, Harahan, LA, 70123."  (Doc. 1-1 at 12-13 at Section 6.14).  The Promissory Note

does not require any additional notice.  (Doc. 1-2 at 4 at ¶8).

On September 9, 2008, the property was appraised at $5,000,000.00.  (Doc. 159-3).

Through the years, Vision Bank and 145 repreately modified the Loan Agreement and

Promissory Note, such that the maturity date was extended to June 28, 2010. (Docs. 1-7 through 1-15,

1-19; Doc. 143-7 at 2-5 (Aff. Duncan at ¶¶6-15); Doc. 143-2; Doc. 143-7 at 14-17).

On March 18, 2009, Kessler executed a second individual unlimited continuing guaranty,

through which she "unconditionally guarantee[d] the prompt and full payment" of all of Defendant

145's "present and future…absolute and contingent…indebtedness, liabilities and obligations."  (Doc.

1-17; Doc. 143-7 at 18-21).  In so doing, Kessler again expressly waived notices of "presentment for

payment, demand, protest, dishonor, default, and non-payment pertaining to the Indebtedness and this

Guaranty."  (Docs. 143-7 at 19 at ¶5).

On March 29, 2010 the property was appraised at $2,500,000.00 with a marketing period of 6-

12 months.  (Doc. 159-4; Doc. 143-7 at 7 (Aff. Duncan at ¶25)).  On May 28, 2010, Claud Clark, III,

P.C. appraised the property (for a second time) at $2,159,000.00.[3]  (Doc. 159-5).

---

3 Mr. Clark stated: "[t]he value estimate is predicated upon current market conditions, balanced supply and
demand factors and a stable economy with favorable interest rates. At the time of my inspection of the
subject an oil spill was present in the Gulf of Mexico. This has created uncertainty in our market."  (Doc.

145 did not satisfy the Promissory Note by its maturity date of June 28, 2010. (Doc. 143-7 at 5 (Aff. Duncan at ¶18).  Specifically, according to 145 member James Dalton, "[w]e have not paid it back." (Doc. 143-3 at 2 (Dep. Dalton at 200)).  Similarly, Kessler testified that she does "not have the assets or income to pay [the entirety of the debt due under the Note]." (Doc. 143-5 at 2 (Dep. Kessler at 183)).  Likewise, the other members testified that they cannot repay the debt. (Doc. 143-4  at 2 (Dep. Deichman at 80); Doc. 143-6 at 2 (Dep. Lukinovich at 266)). Failure to make the payments in a timely manner constitutes an event of default under the Promissory Note.  (Doc. 1-1 at 8 at Article V; Doc. 1-2 at 3 at ¶8).

On September 27, 2010, Vision Bank mailed notice of foreclosure as well as a copy of the foreclosure publication (to be published in October 2010) to 145 (to the address provided in the Loan Agreement and to its registered agent Alan M.Thames). (Doc. 143-7 at 44-45; Doc. 143-7 at 6 (Aff. Duncan at ¶¶21-22); Doc. 150-2 (Decltn. Matthews)). Notice of the foreclosure sale was published on October 1, 2010, October 8, 2010 and October 15, 2010, in *The Islander* (a newspaper published in Baldwin County, Alabama).  (Doc. 143-7 at 5-6 (Aff. Duncan at ¶¶20-21; Doc. 143-7 at 43). A non-judicial foreclosure sale of the property was scheduled for October 22, 2010.  (Id.)  On October 22, 2010, the property was auctioned off at the Baldwin County Circuit Court, at which time Vision Bank was the sole bidder and purchased the property for $1.75 million.  (Doc. 143-7 at 7 (Aff. Duncan at ¶24); Doc. 143-7 at 72-75).

On November 10, 2010, the property was appraised at the request of Vision Bank, by Faulkner and Associates, LLC, at $2,324,000.000 with a marketing period of 90-180 days; or $3,320,000 with a marketing period of 12-18 months.  (Doc. 143-7 at 7 (Aff. Duncan at ¶26)).  On July 2, 2011, Frederick H. Hall prepared a "retrospective appraisal" for counsel for Vision Bank "to be used for Litigation

159-5 at 3).

Purposes," valuing the property at $1.965 million on October 22, 2010, with a 9-12 month marketing period.  (Doc. 150-6 (Decltn. Hall)).

**IV.**   **Discussion**

Before addressing the parties' substantive contentions, the Court must first decide which state's law governs the claims and counterclaims in this diversity action between a Florida corporation (Vision Bank) and a Louisiana limited liability company comprised of members who are residents of the State of Illinois and the State of Louisiana (including Kessler) (Doc. 1 at 2).

"[A] federal court in a diversity case is required to apply the laws, including principles of conflict of laws, of the state in which the federal court sits." Manuel v. Convergys Corp., 430 F.3d 1132, 1139 (11th Cir. 2005) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). Alabama courts follow the traditional conflict-of-law principles of *lex loci contractus* and *lex loci delicti.* Lifestar Response of Ala., Inc. v. Admiral Ins. Co., 17 So. 3d 200, 213 (Ala. 2009). Accordingly, in Alabama, contract claims are governed by the laws of the state where the contract was made, unless the contracting parties chose a particular state's laws to govern their agreement, Cherry, Bekaert & Holland v. Brown, 582 So. 2d 502, 506 (Ala. 1991), and the substantive rights of tort claimants are determined according to the laws of the state where their alleged injuries occurred. Fitts v. Minn. Mining & Mfg. Co., 581 So. 2d 819 (Ala. 1991).  In this case, the Loan Agreement, Promissory Note and two (2) Kessler Guaranties provide that they shall be governed by and construed in accordance with the laws of the State of Alabama. (Doc. 1-1 at 13 at Section 6.15; Doc. 1-2 at 5 at ¶12; Doc. 1-5 at 3 at ¶10; Doc. 143-7 at 19 at ¶20), so the Court will apply Alabama law to the breach of contract claims. The Court will also apply Alabama law to the tort-based claims asserted by 145 and Kessler, as their alleged injuries resulted from the foreclosure sale of property at the Baldwin County Courthouse (located in Bay Minette, Alabama).

**A.**   <u>**Vision Bank's Breach of Contract Claim Against 145**</u>

In the Complaint, Vision Bank alleges that 145 breached the Promissory Note because the bank satisfied all of its obligations thereunder but 145 did not (by its maturity date), damaging the bank as a result. (Doc. 1 at 11-12). Under Alabama law, the essential elements of a cause of action for breach of contract are the existence of a valid contract binding the parties, a plaintiff's performance under the contract, a defendant's nonperformance, and damages. <u>See</u>, <u>e.g.</u>, <u>Jones v. Alfa Mut. Ins. Co.</u>, 875 So. 2d 1189, 1195 (Ala. 2003). Vision Bank has established the existence of a valid contract (the Promissory Note executed with 145), its performance under the contract (loaning 145 the $8,933,000.00), 145's non-performance (145's failure to pay the amount due by the Promissory Note's maturity date), and its damages (loss of the amount loaned to 145 and not repaid). <u>See</u> *supra* Section III.

145 does not dispute the validity of the Promissory Note, its failure to make all scheduled payments, or the fact that Vision Bank was damaged by 145's failure to satisfy its debt. 145's sole defense to Vision Bank's breach of contract claim is that Vision Bank failed to fully perform under the Promissory Note because Vision Bank violated the implicit requirement of good faith and reasonableness by conducting the foreclosure sale, failed to provide adequate notice of the foreclosure to Defendant 145, purchased the property at a price so low as to shock the conscience of the Court, and has not accounted for certain money collected by Vision Bank. (Doc. 159 at 6-9). These allegations form the basis of 145's counterclaim for wrongful foreclosure but they do not negate the fact that Vision Bank performed under the Promissory Note by loaning money to 145. Thus, the Court finds that the record establishes Vision Bank's entitlement to summary judgment on its breach of contract claim, such that Vision Bank's motion for summary judgment on same is **GRANTED**.

**B.**   <u>**Vision Bank's Guaranty Obligations Claim Against Kessler**</u>

Vision Bank contends that pursuant to the continuing guaranty agreements, Kessler is liable for

all sums owed to Vision Bank under the Promissory Note.  (Doc. 1 at 12).

"Every suit on a guaranty agreement requires proof of the existence of the guaranty contract, default on the underlying contract by the debtor, and nonpayment of the amount due from the guarantor under the terms of the guaranty."  Delro Industries, Inc. v. Evans, 514 So.2d 976, 979 (Ala. 1987). See also e.g., Vision Bank v. Algernon Land Co., LLC, Slip Copy, 2011 WL 1380062, *7-8 (S.D. Ala. Apr. 12, 2011); Sharer v. Bend Millwork Sys., Inc., 600 So.2d 223, 225-226 (Ala. 1992).  If the guaranty is a continuing guaranty (such as those at issue in this case) an additional element of notice to the guarantor of the debtor's default must also be proven; however, the guarantor can waive this notice requirement through the terms of the guaranty.  See, e.g., Sharer, 600 So.2d at 226.  It has been held, however, that "[t]he language of the guaranty is controlling in determining whether the holder of the guaranty is under a duty to notify the guarantor of a default by the principal, and notice need not be given when the terms of the guaranty expressly dispense with the need for it."  Wells Fargo Bank v. Richard D. Horne, LLC, Slip Copy, 2010 WL 5376341, *3 at n. 1 (S.D. Ala. Dec. 27, 2010).  See also RBC Bank v. CMI Electronics, Inc., Slip Copy, 2010 WL 2719096, *2 (M.D. Ala. Jul. 8, 2010) (providing that "[i]n the case of a continuing guaranty, it is also necessary to prove that the guarantor received notice of the debtor's default, unless that right has been waived by the terms of the guaranty contract.").  See also generally Ex parte Kaschak, 681 So.2d 197, 200 (Ala. 1996).  Further, when a contract is "one of absolute guaranty," as in this case, "the failure of the principal to pay the debt within the time provided in the principal contract fixed the liability of the guarantors, without regard to the question of the principal's solvency or insolvency, and the plaintiff was under no duty to the guarantors to pursue its remedy against the principal as a prerequisite to its right to recover against the guarantors." Ehl v. J.R. Watkins Medical Co., 112 So. 426, 426 (Ala. 1927). [4]

---

4 See also e.g., In re Waters, 8 B.R. 163, 167 (Bankr. N.D. Ga. 1981) (providing that "[g]enerally, for a

In this case, each of these elements is met. The uncontroverted evidence shows that Kessler executed an Unlimited Continuing Guaranty Agreement and a Second Unlimited Continuing Guaranty Agreement, each of which is deemed a valid, binding contract under Alabama law, and that Kessler expressly waived notice in the guaranties.  See *supra*.  As such, Vision Bank has established that: 1) 145 is in default of the Promissory Note; 2) Kessler failed to satisfy her obligations under the guaranties to make the due, prompt and punctual payment of the entire indebtedness; 3) Vision Bank has been damaged due to Kessler's breach of the guaranties; and 4) Vision Bank was *not* required to notify Kessler of 145's default as notice was expressly waived.  See *supra* Section III.  Thus, Vision Bank's motion is **GRANTED** as to Count Two.

### C.    Counterclaims

Vision Bank moves for summary judgment on the counterclaims alleged by Defendant/Counter-Plaintiff Kessler and/or 145, for breach of contract (145 and Kessler), wrongful foreclosure (145 and Kessler), declaratory judgment (145 and Kessler)); unjust enrichment (145 ); fraudulent suppression (145); and fraudulent misrepresentation (145).

### 1.    Breach of Contract (145 and Kessler)

The breach of contract counterclaims alleged by 145 and Kessler consist of essentially the same arguments these parties have made in opposition to Vision Bank's motion for summary judgment on Count Two of the Complaint for breach of contract. As discussed *supra*, these arguments lack merit as they relate to Vision Bank's performance under the contract and summary judgment has been granted in favor of Vision Bank such that 145 and Kessler's counterclaims for breach of contract are

---

guarantor to become liable under a guarantee of payment there need only be a failure of the primary obligor to make payment"); In re Southern Cinemas, Inc., 256 B.R. 520, 527 (Bankr. M.D. Fla. 2000) (holding under Alabama law that "[i]n order to be entitled to enforce the obligation of the contract of guaranty, the creditor must show that the guaranteed debt or obligation is due."). Thus, a creditor may pursue its remedy against the guarantor without first seeking to collect from the principal debtor. Pilalas v. Baldwin Cnty. Sav. & Loan Ass'n,

DISMISSED.

    2.    <u>Wrongful Foreclosure (145 and Kessler)</u>

    145 alleges that Vision Bank is liable for wrongful foreclosure because it violated Section 35-10-1 of the <u>Alabama Code</u> "by rigging" the foreclosure notice and sale to deprive 145 of its (and Kessler's) rights "in the agreement and in the subject property." (Doc. 111 at 20). 145 contends further that Vision Bank used "legal process provided by the State of Alabama" in a manner which violated their rights to due process under the U.S. Constitution. (<u>Id</u>.) Kessler alleges that Vision Bank had a duty of good faith and fair dealing to conduct the foreclosure sale in compliance with Section 35-10-1 *et seq*. and 35-10-11 *et seq* of the <u>Alabama Code</u>, but breached that duty by failing to provide sufficient notice of the sale to Kessler and by not obtaining the best possible price for the property but instead purchasing the property at a "shockingly low cost" of $1.75 million. (Doc. 47 at 11).

    "[W]hile there is a long-recognized cause of action in Alabama for 'wrongful foreclosure,' it is an open-ended equitable action rising from the trust relationship between a mortgagor and a mortgagee." <u>In re Sharpe</u>, 391 B.R. 117, 152 (Bankr. N.D. Ala. 2008). "A mortgagor has a wrongful foreclosure action whenever a mortgagee uses the power of sale given under a mortgage for a purpose other than to secure the debt owed by the mortgagor.'" <u>Id</u>.

    a.    <u>Kessler</u>

    145, LLC is the sole mortgagor of the property whereas Kessler is strictly an independent guarantor of the Promissory Note and a member of 145, LLC.  Under Alabama law, as a member of 145, LLC, Kessler has no interest in specific limited liability company property (*i.e*., the property at issue), as it was solely owned by 145 at all relevant times.  <u>Ala</u>. <u>Code</u>. 10A-5-4.02(a)-(b). Thus, guarantor Kessler lacks standing to challenge the validity of the non-judicial foreclosure. Accordingly,

---

549 So. 2d 92, 94 (Ala. 1989).

Vision Bank's motion as to Kessler's counterclaim for wrongful foreclosure is **GRANTED.**

    **b.**    <u>**145, LLC**</u>

    1)    <u>Notice of Foreclosure Sale</u>

As to 145's claim that it did not receive adequate notice of the foreclosure sale in violation of its (and Kessler's) due process rights under the U.S. Constitution (Doc. 111 at 20 at ¶33), "[t]he due process claim…is meritless because a foreclosure sale by a private mortgagee does not involve state action." <u>Crooked Creek Prop., Inc. v. Hutchinson</u>, Slip Copy, 2011 WL 2581509, *1 (11th Cir. Jun. 30, 2011). As such, Vision Bank's motion is **GRANTED** as to 145's wrongful foreclosure counterclaim based on due process.

Regarding notice to Kessler, no such notice was required. As detailed *supra*, Kessler waived notice in the guaranties. While 145 contends that the language of the guaranties is ambiguous as the notice provisions do not expressly address foreclosure notices, the Court cannot agree. Through the guaranties, Kessler waived notice "of <u>every</u> kind" including notice of "presentment for payment, demand, default, and non-payment pertaining to the Indebtedness and this Guaranty." As such, Vision Bank's motion is **GRANTED** as to 145's wrongful foreclosure counterclaim based on lack of notice to Kessler.

Moreover, 145 contends that it did not receive adequate notice of the foreclosure sale, as provided for in the Loan Agreement, as Vision Bank "rigged the foreclosure notice." However, 145 has failed to submit any evidentiary support for this claim. The Loan Agreement provides for notice to be sent only to the Borrower via 145, LLC, 1000 Riverbend Boulevard, Suite A, St. Rose, LA, 70097 (Attn.: James Dalton), with a copy to be sent to David J. Lukinovich, 5740 Citrus Boulevard, Suite 102, Harahan, LA, 70123. (Doc. 1-1 at 12-13 at Section 6.14). The record reveals also, that a copy of the foreclosure publication was sent with a cover letter dated September 27, 2010, to Defendant 145, at the

addresses provided in the Loan Agreement. (Doc. 143-7 (Aff. Duncan at 6 at ¶21); Doc. 143-7 at 44-45 (9/27/10 Letter)). While 145 is correct that the notice sent to 145 at Riverbend Boulevard did not specifically state "Attn.: James Dalton," 145 has not established how that particular (and seemingly typographical) omission undermines notice or means that notice was not effective and adequate as to 145 (given that the notice was, in fact, sent to the address provided for in the Loan Agreement). The same holds true for the fact that a "copy" of the notice was not sent to Lukinovich. While a "copy" of the notice was not sent to Lukinovich, 145 has not established how this undermines the fact that notice was sent to 145, LLC c/o the Riverbend Boulevard address. See, e.g., Roberts v. Security Trust and Sav. Bank of Brilliant, 470 So.2d 674 (Ala. 1985) (providing that allegations that collateral was sold in a commercially unreasonable manner and that there was insufficient notice of the sale based on mere belief is inadequate, vague and general assertions that do not raise genuine issues of material fact). Moreover, Vision Bank also published the foreclosure sale notice as required under Alabama law (Section 35-10-11 through Section 35-10-16 Ala. Code. See also e.g., Farris v. Jim Walter Homes, Inc., 519 So.2d 1338 (Ala. 1988) (providing that notice via publication was sufficient); Bullock v. R.Bishop, 435 So.2d 24 (Ala. 1983) (same). Further, Vision Bank sent "extra" notice to 145's registered agent, Alan M. Thames, which was not required under the Loan Agreement. See supra. The Court finds as a matter of law that Vision Bank's notice of foreclosure was not deficient.

In sum, 145 has not established that the actions of Vision Bank were either outside the boundaries of the foreclosure or taken for some purpose other than to secure the debt owed by the mortgagor. In re Sharpe, 391 B.R. at 152-153. Accordingly, Vision Bank's motion on 145's wrongful foreclosure counterclaim based on inadequate notice to 145 is **GRANTED.**

      2)      Foreclosure Sale Price

145 contends that Vision Bank "rigged the foreclosure sale" because the bank paid $1.75

million for the property which is "slightly less than 20% of the loan amount and approximately 12.5% of the original appraised value" of approximately $14 million. (Doc. 161 at 12-13). 145 also points out that the sale amount is "lower than the **lowest** appraised value of the property ($1.965 million). (Id.)

The duty a mortgagee owes a mortgagor in a foreclosure proceeding is one of good faith and fairness[.]" Brabham v. American Nat. Bank of Union Springs, 689 So.2d 82, 88 (Ala. Civ. App. 1996). A foreclosure will not be set aside on account of mere inadequacy in the price bid unless that price is so "grossly inadequate" as to shock the conscience of the court. See Hayden v. Smith, 113 So. 293, 295 (Ala. 1927). Though "each case must be judged by its own circumstances", to determine whether a bid is grossly inadequate a number of state and federal cases provide guidance. For example, in Mt. Carmel Estates, Inc. v. Regions Bank, 853 So.2d 160 (Ala. 2002), the Alabama Supreme Court held that a mortgagee's bid at a foreclosure sale was not grossly inadequate where the bid was equal to 81% of the value assigned to the property by a post-foreclosure appraisal that contemplated a long-term development and subdivision marketing plan. Id. at 171. Similarly, the Eleventh Circuit affirmed the judgment of a trial judge who concluded that a foreclosure sale price equal to 20%, 30% or 66% of a property's fair market value was not so inadequate as to shock the judicial conscience. CS Assets, LLC v. West Beach, LLC, 370 Fed. Appx. 45, 46 (11th Cir. 2010) (per curiam).

At the outset, 145's suggestion that the loan amount is relevant to the issue of whether the foreclosure price was proper lacks merit. Additionally, while the purchase price at foreclosure was approximately 12.5% of the 2005 appraisal, the 2005 appraisal value is irrelevant, as that appraisal by Mr. Clark was a market value evaluation some five (5) years prior. 145's reliance on the $14 million evaluation in 2005 ignores the reality that values of real estate had dropped significantly in the Gulf Coast area by the time of the 2010 foreclosure and many properties were worth less than the indebtedness owed on them. Similarly, 145's claim that Vision Bank's bid was shockingly low because

13

it was lower than the $1.965 million appraisal (the "lowest"), is likewise misplaced.  As explained in

Mt. Carmel Estates, 853 So.2d at 166-167 (citing BFP v. Resolution Trust Corp., 511 U.S. 531, 537-

539 (1994) (emphasis in original):

> market value…has no applicability in the forced-sale context; indeed, it is the very *antithesis* of forced-sale value.  'The market value of ... a piece of property is the price which it might be expected to bring if offered for sale in a fair market; not the price which might be obtained on a sale at public auction or a sale forced by the necessities of the owner, but such a price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular ... piece of property.'…In short, 'fair market value' presumes market conditions that, by definition, simply do not obtain in the context of a forced sale…An appraiser's reconstruction of 'fair market value' could show what similar property would be worth if it did not have to be sold within the time and manner strictures of state-prescribed foreclosure. But property that must be sold within those strictures is simply worth less. No one would pay as much to own such property as he would pay to own real estate that could be sold at leisure and pursuant to normal marketing techniques…

145 has not established how Vision Bank's purchase price at foreclosure of $1.75 million is

"shockingly low" to "shock the conscience" based on the $1.965 million appraisal. Indeed, based on

this appraisal, Vision Bank actually purchased the property for approximately 89% of the market value

and thus, a reasonable factfinder could not find that the price was so inadequate to shock the

conscience.

Additionally, it is noteworthy that 145 has not submitted its own valuation of the property or

asserted that the property should have been valued at "x" amount at the time of the foreclosure sale.

Instead, 145 apparently relies on the assertion that an individual named Mike Dalton "would have paid

significantly more" for the property if he had known about the sale.  (Doc. 161 at 14 (citing Doc. 159-

11)).  However, this contention ignores the fact that public notice was given of the foreclosure sale.

Moreover, 145 has submitted no evidence of bad faith, unfairness, misconduct, fraud or

mismanagement on the part of Vision Bank in connection with the foreclosure.  Based on the foregoing,

the Court finds that as a matter of law the foreclosure price of $1.75 million was not so low as to shock

the Court's conscience. Accordingly, Vision Bank's motion is **GRANTED** as to 145's counterclaim for wrongful foreclosure based on the foreclosure sale price.

### 3.      Unjust Enrichment (145)

145 alleges that Vision Bank has been unjustly enriched through its unlawful practices relating to the June 14, 2005 appraisal of the subject property (including "rigging" the foreclosure notice and sale), such that "Vision Bank and its agents have received millions of dollars...which should be disgorged and returned[.]" (Doc. 111 at 23).

In Alabama, unjust enrichment is an equitable remedy which issues only where there is no adequate remedy at law. See, e.g., Mantiply v. Mantiply, 951 So.2d 638, 654 (Ala. 2006); Teleprompter of Mobile, Inc. v. Bayou Cable TV, 428 So.2d 17, 20 (Ala. 1983). "The doctrine of unjust enrichment … permit[s] the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another." Flying J Fish Farm v. Peoples Bank of Greensboro, 612 So.3d 1185, 1193 (Ala. 2008) (citations omitted). Thus, Alabama law makes clear that unjust enrichment is an equitable remedy only to be invoked where there is no available remedy at law. See, e.g., Mantiply, 951 So.2d at 654; Teleprompter of Mobile, 428 So.2d at 20.  145's unjust enrichment counterclaim arises from the contracts at issue -- the Loan Agreement and the Promissory Note -- the same documents upon which the breach of contract claim and other counterclaims are based. Thus, 145's unjust enrichment claim is precluded, as there is an adequate remedy at law for damages under the breach of contract theory of recovery. See generally Pearson's Pharmacy, Inc. v. Express Scripts, Inc., 505 F. Supp. 2d 1272, 1278 (M.D. Ala. 2007). In sum, the Court's finding that the Loan Agreement and Promissory Note are valid contracts is fatal to 145's unjust enrichment claim. See, e.g., Blackstone, 30 F.3d at 120; Pearson's Pharmacy, 505 F. Supp. 2d at 1278 (dismissing an unjust enrichment claim with prejudice because plaintiffs had an adequate remedy at law for damages under a theory of breach of contract). Moreover,

145 has wholly failed to respond to Vision Bank's summary judgment motion on this counterclaim, and thus has presented no evidence to support same. As such, Vision Bank's motion as to 145's counterclaim for unjust enrichment is **GRANTED.**

      **4.**      **Fraud Claims (145)**

As an initial matter, the Court notes that "[t]he statement of value set forth in a real property appraisal is not per se a factual representation of the sort which will support a fraud case; to the contrary…real estate appraisals are generally considered statements of opinion, rather than statements of fact, for purposes of fraud or concealment claims…and that erroneous or inaccurate appraisals will not support fraud claims absent special circumstances…However, a false or inaccurate opinion of value in an appraisal will support a fraud claim where intent to deceive motivates the inaccuracy." 26 Richard A. Lord, *Williston on Contracts* § 69:8 (4th ed. - May 2011) (footnotes ommitted). See also e.g., Brushwitz v. Ezell, 757 So. 2d 423 (Ala. 2000).

      **a.**      **Fraudulent Misrepresentation**

145's fraudulent misrepresentation counterclaim against Vision Bank is two-fold: 1) Vision Bank fraudulently misrepresented to 145 (and others) the value of the property at the time of the loan to induce 145 to borrow, guaranty and pay millions to the bank; and 2) Vision Bank fraudulently misrepresented to 145 (and others) that it would not foreclose on the property, yet did.

Under Alabama law, to establish a claim for fraudulent misrepresentation, 145 must show that: 1) Vision Bank made a misrepresentation (false statement); 2) concerning a material existing fact; 3) 145 relied on the misrepresentation; and 4) the reliance was to 145's detriment (*i.e.*, 145 was damaged as a proximate result of so relying). Ala. Code § 6-5-101 (1975). See, e.g., Ex parte Novartis Pharms. Corp., 991 So. 2d 1263, 1275 (Ala. 2008); Boswell v. Liberty Nat'l Life Ins. Co., 643 So. 2d 580, 581 (Ala. 1994).

16

1)      Misrepresentation Based on Property Value

145 alleges that in connection with the guaranty agreements executed on June 9th and June 10th, "Vision Bank and its agents represented that the value of the subject property which served as collateral on the loan…exceeded $14,000,000…145 relied upon Vision Bank's representations concerning the value of the subject property." (Doc. 111 at 12-13 at ¶1). 145 alleges also, that it signed the Promissory Note based on Vision Bank's representations that the value of the property was $14.4 million and based on the belief that the appraisal had been conducted "consistent with federal regulations which require an independent appraisal ordered by a lender." (Id. at 13 at ¶3). In sum, 145 alleges that Vision Bank knew the $14.4 million appraisal was false and "grossly" inflated the value to induce 145 "to borrow, guaranty and pay millions" to Vision Bank. (Id. at 24-25). 145 alleges further, that it was "reasonable in relying to its detriment" upon Vision Bank's statements as to the property's value and "by believing that the bank was telling the truth about the value of the property at the time of the loan." (Id.) 145 claims that due to Vision Bank's fraudulent misrepresentation of the property value and its reliance on said value, it suffered economic damages and other losses "in an amount which has not yet been determined." (Id.)

145 has not provided sufficient (or any) evidence that Vision Bank misrepresented the value of the property in 2005. Moreover, 145 has not submitted any evidence establishing that the $14.4 million valuation of the property in 2005 was false (i.e., that this was not the true and accurate value of the property at that time), and/or that Vision Bank made any "active[]" misrepresentations. Rather, 145 simply relies on its own conclusory allegations. Even more fundamentally, the representation as to the property's value in 2005 was made by an independent appraiser Claud Clark, not by Vision Bank. 145 has not submitted any evidence that Vision Bank colluded or conspired with Mr. Clark to "grossly inflate" the value to then induce 145 to execute the loan documents. Thus, because 145 has failed to

establish certain requisite elements for its fraudulent misrepresentation counterclaim, Vision Bank's motion on same is **GRANTED.**

        2)     <u>Misrepresentation by Promising Not to Foreclose</u>

145 alleges that Vision Bank misrepresented that it would not foreclose on the property, and that it relied on the misrepresentation and so did not act to mitigate its losses or attempt to arrange for the purchase of the property before/during the foreclosure. (Doc. 111 at 25). 145 adds that it was "intentionally lulled into a sense of false security" by Vision Bank. (<u>Id</u>.) Thus, claims 145, due to Vision Bank's fraudulent misrepresentations as to its intent to foreclose, and then "the act of foreclosing coupled with reliance upon the fraudulent misrepresentation," it suffered economic damages and other losses "in an amount which has not yet been determined." (<u>Id</u>.)

145's fraudulent suppression counterclaim is based on Vision Bank's purported "false statement" that it would not foreclose on 145's property in July 2010. As evidentiary support, 145 relies entirely on a July 25, 2010 e-mail (constituting what appears to be part of settlement or mediation negotiations between Vision Bank and 145), in which Vision Bank provides two offers to 145 for pre-litigation settlement of the case. (Doc. 159-7 (8/25/10 e-mail)). The offer of settlement and compromise expired on July 28, 2010. (<u>Id</u>.) In its email to 145, Vision Bank does not specifically represent that it "will never foreclose" -- rather, Vision Bank states that it "is not a real estate holding or investment company and has no desire to add to its REO inventory. As a matter of course, Vision Bank forecloses only when there are insufficient other borrower and guarantor assets to satisfy the debt in full." (<u>Id</u>.) As such, at best, this was a representation by Vision Bank that it would not foreclose on the property if 145 accepted one of the two offers of settlement by July 28, 2010. This, however, did not occur. The record reveals further, that Vision Bank did not foreclose on the property until October 22, 2010, after publishing notice of its intent to foreclose and sending copies of the foreclosure notice to

145 and its registered agent. Accordingly, Vision Bank's motion as to this counterclaim is **GRANTED.**

###### b.   <u>Fraudulent Suppression</u>

145 alleges that Vision Bank and its agents/representatives fraudulently suppressed material facts that it had a duty to fully disclose[5] by: 1) failing and/or refusing to reveal the true and accurate appraisal value of the property before the Promissory Note was executed; and 2) failing and/or refusing to properly notify 145 of the foreclosure proceedings. (Doc. 111 at 26). Thus, claims 145, due to Vision Bank's suppression of these material facts coupled with 145's reliance on same, 145 suffered economic damages and losses "in an amount..not yet..determined." (<u>Id</u>.)

Fraudulent suppression is the "suppression of a material fact which the party is under an obligation to communicate. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." <u>Ala</u>. <u>Code</u> § 6-5-102.  To establish fraudulent suppression, 145 must demonstrate: 1) a duty on the part of Vision Bank to disclose an existing material fact; 2) suppression of the fact by Vision Bank; 3) that Vision Bank had actual knowledge of the fact; 4) that Vision Bank's suppression of the fact induced 145 to act; and 5) 145 suffered actual damage as a proximate result of acting or of not acting. <u>See</u>, <u>e.g.</u>, <u>Brock v. Baxter Healthcare Corp.</u>, 96 F. Supp. 2d 1352, 1359 (S.D. Ala. 2000); <u>Ex Parte Household Retail Servs., Inc.</u>, 744 So.2d 871, 879 (Ala. 1999); <u>First Ala. Bank of Montgomery, N.A. v. First State Ins. Co.</u>, 899 F.2d 1045, 1056 (11th Cir. 1990); <u>Glenn Const. Co., LLC v. Bell Aerospace Servs., Inc.</u>, 785 F. Supp. 2d 1258, 1275 (M.D. Ala. 2011) (citing <u>State Farm Fire & Cas. Co. v. Slade</u>, 747 So.2d 293, 323-324 (Ala. 1999) and <u>Ala</u>. <u>Code</u> § 6-5-102)).  Additionally, a party faced with a motion for summary judgment on a fraudulent suppression claim must offer substantial evidence as to each of the elements. <u>See</u>, <u>e.g.</u>,

---

5  Defendant/Counter-Plaintiff 145 premises this "duty to fully disclose" on Vision Bank's "superior knowledge of the circumstances the conduct of Vision Bank, the relative sophistication of the parties and especially the misrepresentations of fact" made.  (Doc. 111 at 27).

Cork v. Marriott Intern, Inc., 426 F. Supp. 2d 1234, 1246-1247 (N.D. Ala. 2006) (citing Mason v. Chrysler Corp., 653 So.2d 951, 954 (Ala. 1995)).

> 1)    Suppression of Property Value

145 contends, based on Section 6-5-102 of the Alabama Code and Gess v. United States, 909 F. Supp. 1426, 1447 (N.D. Ala. 1995), that Vision Bank had a duty to disclose "the true and accurate appraisal value of the property" before the Promissory Note was executed based on "the particular circumstances" of this case.  (Doc. 161 at 21-23).

As to the first element for a fraudulent suppression claim, see supra, whether Vision Bank had a duty to disclose is a question of law. Barnett v. Funding Plus of America, Inc., 740 So.2d 1069, 1074 (Ala. 1999).  Such a duty may be created either by a "confidential relations[hip]" between the parties, or from the "particular circumstances of the case." Ala. Code § 6-5-102; see, e.g., Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc., 611 So.2d 238, 245-246 (Ala. 1992); Section 6-5-102 (Ala. Code). 145 alleges not the existence of a confidential relationship, but that the "particular circumstances" establish a duty to disclose because Vision Bank is a frequent lender of construction development loans, Vision Bank had superior knowledge or expertise not shared by 145, and 145 was not well-versed in borrowing millions for real estate development.  (Doc. 161 at 23).  Despite 145's endeavor to rely on these "particular circumstances," when the parties dealt with each other "at arms' length" with no confidential relationship, "no obligation to disclose arises when information is not requested." See, e.g., Freightliner L.L.C. v. Whatley Contract Carriers, L.L.C., 932 So.2d 883, 892 (Ala. 2005).  As such, a bright line rule generally applies: the parties have no general obligation to disclose, but each has an affirmative duty to respond "truthfully and accurately" to direct questions from the other.  Shutter Shop, Inc. v. Amersham Corp., 114 F. Supp. 2d 1218, 1225 (M.D. Ala. 2000).[6]

---

6 The Alabama Supreme Court has held that "[w]hile the relationship between a bank and its customer has been

145 alleges a purported "superior knowledge" by Vision Bank; however, there is no evidence that Vision Bank knew that the $14.4 million appraisal was incorrect.  Moreover, according to Erica Duncan, Special Assets Supervisor of Vision Bank, Vision Bank obtained the original 2005 appraisal for $14.4 million (prepared by independent appraiser Claud Clark) "to evaluate its…risk of making the loan" and 145 had applied for the loan before the appraisal was prepared. (Doc. 143-7 (Aff. Duncan at ¶¶2-3)). 145 has neither submitted evidence that it requested information from Vision Bank concerning the 2005 appraisal by Claud Clark, nor identified any further support for its claim that Vision Bank had a "duty to disclose" because it had made specific inquiries or directly asked Vision Bank about the property value.  Without evidence of a specific or direct inquiry by 145, based on this "arms' length" commercial transaction, the evidence does not support a finding that Vision Bank had a duty to disclose.  Accordingly, as 145 has failed to establish a duty to disclose and/or evidence that the 2005 appraisal value was not accurate (*and* that Vision Bank knew this material fact yet suppressed same), Vision Bank's motion on this counterclaim is **GRANTED.**

     2)       <u>Suppression by Failure to Provide Foreclosure Notice</u>

145 contends that Vision Bank is liable for fraudulent suppression because Vision Bank: 1) only provided notice to 145 (not specifying that notice was to James Dalton's attention "as required by the Loan Agreement[]") and to the registered agent of 145 Alan M. Thames (who was deceased and did not

---

traditionally viewed by courts as a creditor-debtor relationship which does not impose a fiduciary duty of disclosure on the bank, a fiduciary duty may, nevertheless arise when the customer reposes trust in a bank and relies on the bank for financial advice, or in other special circumstances." <u>Bank of Red Bay v. King</u>, 482 So.2d 274, 285 (Ala. 1985). The court concluded, however, that "[w]hen both parties are intelligent and fully capable of taking care of themselves and dealing at arm's length, with no confidential relations, no duty to disclose exists when information is not requested, and mere silence is then not a fraud." (<u>Id</u>. (citing <u>Mudd v. Lanier</u>, 24 So.2d 550, 562 (Ala. 1945)). The Court emphasized that "[t]here must be active concealment or misrepresentation." (<u>Id</u>.). <u>See also</u> <u>RNH, Inc. v. Beatty</u>, 571 So.2d 1039, 1042 (Ala. 1990) (providing that "a duty to disclose exists in circumstances where parties are not dealing at arm's length[]").

receive such notice); 2) did not provide notice to the guarantors; and 3) did not copy David Lukinovich on same as required under the Loan Agreement.  (Doc. 161 at 23).  The allegations for this tort counterclaim are part of 145's breach of contract counterclaim -- that Vision Bank failed to provide proper notice of the foreclosure sale as required under the terms of the Loan Agreement.  In Alabama, "a mere failure to perform a contractual obligation is not a tort." See, e.g., Barber v. Business Prods. Ctr ., Inc., 677 So.2d 223, 228 (Ala.1996), *overruled on other grounds by* White Sands Group, LLC v. PRS II, LLC, 32 So.3d 5 (Ala. 2009). See also Glenn Constr., 785 F. Supp. 2d at 1293-1294.[7] This fraudulent suppression counterclaim then, is simply a claim for failure to perform a promise based on the contractual terms of the Loan Agreement.  145's unilateral relabeling of this breach of contract allegation as one for fraud does not render it an independent tort. As such, this counterclaim is **DISMISSED.**

###      5.      Declaratory Judgment (145 and Kessler)

The counterclaims by 145 and Kessler for declaratory judgment are premised on the viability of their other counterclaims. Given the foregoing rulings, the counterclaims for declaratory judgment lack merit and summary judgment is **GRANTED** in favor of Vision Bank on same.

### V.      Damages -- Post-Judgment Interest

Vision Bank contends that as of July 27, 2011, it is due an award of damages in the amount of "after all credits and charges" the sum of $6,003,334.60 ($4,596,449.36 in principal balance outstanding and $1,406,885.24 in interest).  (Doc. 143-7 at 8 (Aff. Duncan at ¶28)). Vision Bank also

---

7 As noted in Glenn: "Under Alabama law, there is a distinction between nonfeasance and misfeasance in the performance of a contract. Nonfeasance--i.e. the failure to do what one has promised to do--carries no tort liability absent a duty to act apart from the promise made…misfeasance or negligent affirmative conduct in the performance of a promise can subject an actor to both tort and contract liability…'[I]f there is [a] failure or refusal to perform a promise the action is in contract; if there is a negligent performance of a contractual duty or the negligent breach of a duty implied by law, such duty not being expressed in the contract, but arising by implication of law form the relation of the parties created by the contract, the action may be either in contract or [in] tort….'"

contends that post-judgment interest accrues at the rate contracted to by the parties, 18%, and not at the rate specified in 28 U.S.C. § 1961(a). (Doc. 143-7 at 8 (Aff. Duncan at ¶29)).  As support, Vision Bank relies on a Multipurpose Note & Security Agreement executed in January 2009, by 145 in favor of Vision Bank, which provides that "interest will accrue at a rate of 18.00% per year on the balance of this note not paid at maturity, including maturity by acceleration."  (Doc. 1-15).  The Note & Security Agreement does not specify that this rate applies to post-judgment interest. See, e.g., Newmount U.S.A. Ltd. v. Insurance Co., 615 F.3d 1268, 1276-1277 (10th Cir. 2010 (providing that "[a]n agreement to apply a post-judgment interest rate other than that § 1961 specifies is enforceable so long as the parties indicated their intent to override the statute using 'clear, ambiguous and unequivocal language.'").  Thus, the Court finds that post-judgment interest shall be awarded in accordance with 28 U.S.C. § 1961(a).  Accordingly, Vision Bank's motion as, to the 18% interest rate, is **DENIED.**

**VI.    Attorneys' Fees & Costs**

On summary judgment, Vision Bank requests leave of Court to prove the amount and reasonableness of its attorneys' fees and costs.  It is **ORDERED** that Vision Bank's request is **GRANTED.**  Vision Bank is **ORDERED** to file, on or before **November 18, 2011,** whatever materials it deems necessary and appropriate to support its claim for costs and fees.  Defendants/Counter-Plaintiffs are **ORDERED** to file any Response on or before **December 2, 2011,** at which time the Court will take the matter under submission.[8]

**VII.   Conclusion**

Accordingly, it is **ORDERED** that Vision Bank's Motion for Summary Judgment as to Counts One and Two of its Complaint (Docs. 142-144) is **GRANTED** with the exception of the 18% post-

---

8 The Court will enter a final Judgment specifying the amount of damages, after a determination is made concerning the issue of attorneys' fess and costs.

judgment interest rate; and Vision Bank's Motion for Summary Judgment as the Defendants/Counter-Plaintiffs' counterclaims (Docs. 147-150) is **GRANTED.**

      **DONE** and **ORDERED** this the **4**th day of **November 2011.**

                        /s/ Kristi K. DuBose
                        **KRISTI K. DUBOSE**
                        **UNITED STATES DISTRICT JUDGE**